Filed 1/26/23  In re Madison O. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re MADISON O. et al., Persons Coming Under the Juvenile Court Law. | B316842<br>(Los Angeles County<br>Super. Ct. No. 21CCJP03609A/B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>SILVIA O.,<br><br>     Defendant and Appellant;<br><br>RENE B.,<br><br>     Respondent. |  |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Daniel Zeke Zeidler, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Terence M. Chucas, under appointment by the Court of Appeal, for Respondent.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey M. Blount, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Silvia O. (mother) appeals from the juvenile court's jurisdictional findings (Welf. & Inst. Code, § 300)[1] and dispositional order (§ 361) regarding her daughters, Madison O. (Madison, born Jan. 2010) and Melany B. (Melany, born Oct. 2018).[2]

We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] In her opening brief, mother argues that her appeal only pertains to Madison because jurisdiction was terminated for Melany with a family law order granting her father, Rene B. (Rene), full legal and physical custody. In his respondent's brief, Rene argues that we should consider mother's appeal regarding Melany as our determination may impact his custody order in the future. Ordinarily, the termination of dependency jurisdiction renders an appeal from a prior dependency order moot. But dismissal for mootness is not automatic; we decide it on a "'case-by-case basis.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) We elect to do so here. (*In re D.P.* (Jan. 19, 2023, S267429 ___ Cal.5th ___ [2023 Cal.LEXIS 131].)

2

## FACTUAL AND PROCEDURAL BACKGROUND

*The Family*

This family[3] has come to the attention of the Los Angeles County Department of Children and Family Services (DCFS) multiple times since 1999, with referrals for domestic violence, physical abuse, caretaker incapacity, and emotional abuse due to mother driving the children with a restricted license as a result of her seizure disorder.

Most recently, the family came to the attention of DCFS in July 2021 after a referral was made alleging that mother physically abused Madison.

*Section 300 Petition*

DCFS filed a petition pursuant to section 300, subdivisions (a), (b), and (j), alleging that mother physically abused Madison by hitting her in the face with her keys causing visible scratches; mother placed Madison and Melany in a detrimental and endangering situation by driving a vehicle while the children were passengers despite mother suffering from seizures that prevented her from driving safely; Madison was diagnosed with Oppositional Defiant Disorder and mother medically neglected her by failing to ensure that the child took her medication regularly as prescribed; and mother was unable to appropriately care for Madison's mental and emotional problems and to provide appropriate parental supervision, thereby endangering the

---

[3]     Mother has four other children:  Cindy O., Leonel L., Jr. (Leonel), Byron L. (Byron), who are all adults, and Keileen L. (Keileen), who moved to Belize in 2019 to reside with her father. Rene is Melany's presumed father.  Marvin B. (Marvin) is Madison's father.

3

children's physical health and safety, placing them at risk of harm, damage, danger, and medical neglect.

*Detention Report*

<u>Initial interview with Madison</u>

Madison reported that mother had asked her to get something from the car, Madison refused to go, and Madison began mocking mother and calling mother names. Mother went to the car herself and when she came back, Madison continued making fun of her. Mother grabbed Madison's hands, Madison pushed mother onto the bed and pinned mother down, mother grabbed Madison by the face, and Madison let go of mother. Mother denied she scratched Madison's face with her keys.

Madison said that mother hit first and scratched her face with the keys. She added that mother hit her head repeatedly and that she was bleeding from the scratches. After mother grabbed Madison's face, she was able to grab mother so that mother could not scratch her face with her nails, but mother did scratch her with her keys. Madison reported that she still had five scratches on the left side of her face, the left and right side of her nose, and the outer part of her eye. Madison told the social worker that mother has hit her with a broomstick, hanger, and a belt in the past; this began after the last dependency case closed. Although Madison said that mother has left bruises on her in the past, she was unable to provide a timeline.

Madison said that mother does not physically abuse Melany, but does scare her with a belt. That said, Madison disclosed that mother hits Melany on her hand and her buttocks.

<u>Interview with mother</u>

Mother said that she had asked Madison to get some documents out of her car, Madison did not want to go, and she

4

went to the car herself. At the time, Madison was mocking her, sticking her tongue out at mother, and said that she did not have to listen to mother. When mother told Madison to stop mocking her, Madison pushed mother onto the bed and choked her. Mother said that she had car keys in her hand, but she did not scratch Madison; however, she did scratch Madison with her nails while trying to get Madison off her.

Mother repeatedly said that Madison has behavioral issues; although a therapist told mother to ignore Madison, that did not work. Mother disclosed that law enforcement had come to the home, and they could tell that Madison has behavioral issues; they told mother that Madison should be placed in boot camp. Mother said that Madison received Wraparound services, but she did not improve. According to mother, Madison watched pornographic videos and would talk to men when they were at the mall. When asked what Madison's strengths were, mother said that Madison did not have any strengths.

Mother said that Madison had been prescribed psychotropic medication and, despite the prescription being about five months old, there were still pills in the bottle. When the social worker pointed out that the prescription was old, mother replied that Madison did not like taking the medication because of the side effects. Mother admitted that she did not follow up with Madison's psychiatrist regarding the side effects. Mother said Madison had not taken her medication for a few months.

Mother reiterated that therapy was not helping Madison because the therapist told mother to ignore Madison's behavioral issues and Madison took advantage of this. Because ignoring Madison did not work, mother believed that she needed to discipline Madison and not allow her to do anything she wanted.

Mother denied hitting Madison; she disciplined Madison by hiding the remote control and speaking firmly to her, but did not physically discipline her.

Another interview with Madison

That same day, the social worker again interviewed Madison. Madison said that mother swung keys at her face after she refused to get papers out of the car when mother asked. Madison admitted pushing mother onto the bed, but denied that she choked mother. The social worker observed scratches, three superficial lacerations on the upper left cheek, and a small scratch on Madison's nose. Madison said mother hit her with a broomstick and a belt, but could not remember the last time mother hit her. Madison asked the social worker to place her with her former foster parent. Madison said she is angry with mother because she was molested at the age of seven or eight years old, mother did not believe her, and mother compared Madison to her sister Melany.

Interview with law enforcement

After the interviews, the social worker consulted with law enforcement, who said that mother's account was more credible based on Madison's injuries and they deemed mother the victim and Madison the suspect.

Medical evaluation

The social worker transported Madison and Melany for a medical evaluation. On the way, Madison started crying, covered her face, and said that she wanted to drive on the streets instead of the freeway because she was afraid after mother had been involved in a car accident. Mother told the social worker that Madison was trying to manipulate her.

The examining doctor opined that the injuries on Madison's check were too wide to have been caused by scratches and said fingernail scratches were thinner. The findings from the forensic exam concluded that Madison's injuries were consistent with physical abuse and the injuries to her left cheek were consistent with a history of being hit in the face and scratched with keys. The smaller abrasion under Madison's left eye and on her upper lip were consistent with mother's report that she scratched Madison with her nails. The examining doctor advised the social worker that Madison not go home with mother.

Interview with Byron

Madison's adult sibling Byron arrived to take Madison. He told the social worker that he was also in foster care and group homes and he did not want the same thing to happen to Madison. Byron said that mother may have suffered from postpartum depression after Madison was born, that Melany was nicely dressed and Madison was not, that he felt bad for Madison, and that mother did not treat Melany and Madison equally. When asked if he was concerned about Madison being abused or neglected, Byron said "look at the case history." He did not have a close relationship with mother and did not see mother or his siblings often. Byron said that he had an open dependency case as a nonminor dependent.

While the social worker was speaking to Byron, Madison told him that mother had a car and had been driving. Madison shared that she was scared that mother would have another car accident. Byron appeared shocked to hear that mother was driving again. He stated that mother should not be driving and relayed that mother had had a seizure while driving with Byron

as a passenger, which resulted in an accident where he suffered a broken wrist.

### Interview with Leonel

On July 21, 2021, adult sibling Leonel arrived and said that he could take care of Madison. Leonel also did not have a good relationship with mother, was not involved with mother, and could not comment on the allegations. Madison left with Leonel and his partner.

### Conversation with mother

While the social worker was driving mother and Melany home from the hospital, she asked mother about her medical history and any driving restrictions. Mother became upset and said that the adult siblings' paternal grandmother was trying to ruin her life and called in referrals about mother driving. Mother said she did not have epilepsy; rather, she had convulsions. Mother would not say whether she had driving restrictions; she said she could feel the convulsions before they happened. Mother would not confirm or deny if she was driving and changed the subject.

### Interview with mother

On July 22, 2021, the social worker contacted mother, who "rant[ed]" about Madison lying. She also accused the social worker of having secret conversations with the doctor who examined Madison and Melany, and accused the social worker of having a plan to remove the children to make money. Mother did not take responsibility for any wrongdoing and blamed Madison and DCFS for believing Madison. Mother said that she did not believe the doctor was concerned about physical abuse; instead, she accused the social worker of making this up, and was in denial about the outcome of the forensic exam.

8

The social worker discussed the concerns with mother driving when she has seizures; mother said it was not the social worker's business to bring up anything from the past or anything related to her medical condition. When the social worker explained the child safety concern, mother talked over the social worker, mocked her, and refused to let the social worker talk. Mother also displayed erratic behavior by calling different people during the night to talk about the case, including her 17-year-old daughter, Keileen. Mother wanted the social worker to have a FaceTime call with Keileen, which was when the social worker first learned Keileen was in the home.

Information from prior social worker

The social worker who had handled the voluntary family maintenance case said she was not surprised that allegations had been made because referrals were made while she was servicing the family's voluntary case. The social worker said that Madison had a history of alleging physical abuse and recanting the allegations, and described the child as manipulative. She also disclosed that mother was "cooperative . . . if you're . . . doing what she wants," but if not, DCFS was "the worst in mother's eyes." When the voluntary case was closing, mother asked the social worker if the "case can be flagged so that no more investigation takes place."

Interview with therapist[4]

The therapist reported that scheduling appointments with mother was difficult. She said that Madison had been diagnosed

---

[4] It is unclear from the appellate record whether the therapist is Madison's therapist or mother's therapist or whether she was working with both mother and daughter.

9

with Oppositional Defiant Disorder and that she had manipulative behaviors. Madison had not reported any physical abuse to the therapist; she only stated that mother tapped her on her head or hand. The therapist said that Madison scratched at herself and picked at her scabs.

Later, the social worker followed up with the therapist about mother driving. The therapist reported that on one occasion, mother said that she had gone to the store and when the therapist arrived at mother's home, she saw mother taking grocery bags from her car and there were no other adults around.

Interview with Madison's case manager

The case manager for Madison's afterschool program, Angel Estrella (Estrella), reported that he had invited Madison to participate in afterschool activities at times but, due to her behavioral issues, he did not invite her more often. He also said that mother called him, constantly complaining about Madison being outspoken and not following rules. Estrella said that Madison "cursed him out" the first time he met her and said she has angry outbursts because her mother did not listen to her. He said that mother had told him about their altercation, contending that Madison had laughed at her and strangled her.

*Child and Family Team Meeting*

On July 26, 2021, mother participated in a meeting with DCFS staff to discuss the allegations. The social worker noted that mother did not say anything positive about Madison and had unrealistic expectations of Madison given her diagnosis of Oppositional Defiant Disorder; mother wanted Madison to be "'normal.'" The parties created an action plan for the family, but mother refused to add anything about her driving; she said she no longer had seizures; she only had "convulsions," and had not

had a seizure in a very long time. According to mother, her doctor said that she no longer had the same medical issues. Mother became defensive and said that DCFS was "throwing her medical issues in her face." Mother agreed to provide a letter from her doctor but never did.

On July 26, 2021, the children's social worker again spoke to the prior social worker, who said that mother did not have a car when she was servicing the case. Intead, mother's friends gave her rides or she used a transportation service. She added that mother had a well-documented history of seizures.

On July 28, 2021, the social worker advised mother that DCFS would be seeking removal of Madison and Melany.

On July 30, 2021, the social worker interviewed Keileen. Keileen was worried about her siblings being removed from mother's care. Keileen could not address the allegations, but said that Madison had told her that mother had gotten a car a month ago, even though mother said she was not driving.

DCFS advised the juvenile court that there were 12 previous investigations of physical abuse, but none was substantiated because Madison would report physical abuse and then recant her statements. The concern was that, because of Madison's behavioral issues, she was at high risk of physical abuse by mother. The social worker recommended that the juvenile court detain the children from mother's care.

*Detention Hearing (Aug. 9, 2021)*

After entertaining oral argument, the juvenile court found that there was a substantial danger to the children's physical and mental health and that there were no reasonable means to protect the children without removing them from mother's

11

custody.  The juvenile court ordered that mother have no contact with Melany's father.

*Jurisdiction/Disposition Report*

The October 18, 2021, report includes a long-documented history of referrals involving the family, beginning in 1999 through 2021.

<u>Interview with Madison</u>

On September 8, 2021, the dependency investigator interviewed Madison regarding the allegations.  She did not like living with mother because she had to take care of her sister and mother forced her to clean.

With regard to the allegation of physical abuse, Madison confirmed that mother scratched her face and pulled her hair and described the altercation.  Madison denied choking mother.  Madison said that she had five scratches on her left cheek from mother's nails, and she reported that mother had hit her with keys.  Madison said that mother telephoned her brother, her therapist, and the afterschool program case manager.  Madison said she and mother have had other fights in the past, they do not have a healthy relationship, and they take their anger out on each other.  Madison did not feel safe because mother had had a car accident that year with her and Melany in the car and she thought they were going to die.  Madison said the car accident happened when the voluntary case closed after the social workers stopped coming to the home.  Madison was scared to be in a car because of the accident and because mother has seizures.

Madison reported that after Keileen left, mother started hitting her with a broom or belt.  Madison tried telling her school what was going on, but then lied because mother told her to lie or Melany would be taken away and if she did not lie, it would be

12

her fault.  Madison said she lied because she was raped in a group home and she did not want anything to happen to Melany.  Madison said mother made her lie in video recordings and made her lie about Marvin raping her.  Madison said that she has lied so much, "'[i]t's getting hard to know when to tell the truth or lie.'"

Interview with mother

Mother told the dependency investigator that DCFS was conspiring to remove her children.  She claimed that Madison was watching pornography then said she was watching animals that were going to have sex.  Regarding the altercation she had with Madison, mother changed her story and said she told Madison to take a shower, Madison pushed her, threw her on the bed and grabbed her neck, and mother tried to get Madison off her.  Mother said that she pushed Madison and scratched her left cheek.

Mother said Madison had psychological and developmental issues and that she was impulsive and hyperactive.  Mother did not understand why allegations of abuse were still being made.  After all, she denied hitting Madison and had participated in classes and therapy.

Regarding the allegation that mother was driving knowing she had seizures and had an accident, mother reported that she never hit a pole; rather, a car got in her way and she hit the center divider.  In other words, the accident was not her fault.  Mother said that nothing happened to Madison and Melany.  Mother said she did not have seizures or an epileptic problem.  Mother's car was "'totaled'" in the accident and she bought another car.

13

When asked how long she had been suffering from seizures, mother explained that she had had an operation for a tumor in her head in 2002 and began having seizures a few months after the surgery. For the last five years, she had issues with her right arm, which she would shake. Mother claimed that she no longer had seizures; she had "'convulsions.'" She described the "'convulsions'" to the investigator, saying that her arm would feel hot, she "'space[d] out,'" she would have a blank stare, and she would lower her head.

Mother claimed that she had a note from her doctor regarding her seizures, but the doctor put the wrong dates in the letter. When asked if she was taking her medication as prescribed, mother confusingly said that she kept the bottle and reused it when she refilled Madison's prescription.

With regard to the allegation of medical neglect, mother said she did not give Madison her psychotropic medication as prescribed because Madison was "'always asleep'" and the doctor told mother to stop giving Madison the medication. Mother said she last gave Madison her medication in April and took Madison to therapy and an afterschool program instead. Mother said if she did not care about Madison, she would not have found therapy services, Wraparound services, and the afterschool program.

While the dependency investigator was preparing to leave, mother rested her chin on her arms and "appeared to space out" with a blank stare. (Bolding omitted.) She called out to mother to get her attention and mother fell to the floor. The dependency investigator called for emergency assistance, and when the ambulance arrived, the paramedics said that they had had numerous contacts with mother for her seizures at different

14

locations; some of the firefighters and paramedics knew mother. Mother declined to go to the hospital. One of the paramedics told the dependency investigator that he was aware of her medical diagnosis.

After this incident, mother called the dependency investigator and asked if she was scared. The dependency investigator responded that she was concerned, and mother replied that when she was stressed out, she reacted this way, but said she did not have a seizure. Mother said that she received the corrected doctor's note. The dependency investigator told mother that she was concerned about mother driving if she suddenly lost consciousness under stress; mother said driving was not stressful.

Interview with Melany's father

On September 9, 2021, the dependency investigator interviewed Rene about the allegations. Rene said that the juvenile court ordered mother not to contact him, but she still did. He reported that mother threatened Madison that if she contacted social workers, they would take her and Melany away, and mother would never see them again. He had witness mother verbally abuse Madison; he stated that Madison was always mistreated. Rene said that mother's boyfriend told him that he (the boyfriend) beat mother's children. And, Keileen had told him that mother hit Melany when she was born.

Rene said that mother fainted in the alley once and the children were with her in a stroller. He also said that mother slapped Madison on the face, punched her, and beat Madison like an animal with whatever she could. Mother had also hit Melany in his presence with her hands.

15

With regard to the allegation that mother placed the children at risk by driving when she suffers seizures, Rene said that he was worried about mother driving because she was told numerous times not to drive, but she drove anyways and had had an accident. He also reported that mother suffered a burn last year and mother told him a homeless man threw acid on her; however, the apartment manager told Rene that mother was burned when she was cooking and had a seizure. Rene said that mother does not accept that she places the children at risk.

Regarding the allegation of medical neglect, Rene did not view Madison as "'crazy,'" and mother wanted others to think Madison was sick "'to get money.'" Mother was happy when she was able to collect social security benefits for Madison.

Interview with Madison's father

On September 16, 2021, the dependency investigator interviewed Marvin about the allegation of physical abuse. He said that mother had told him that she and Madison fought about a phone, and Madison hit her and held her by the neck.

With regard to the allegation that mother drove the children when she suffered seizures, Madison's father said Madison told him that she was scared of cars because of accidents.

Regarding the allegation that mother medically neglected Madison, her father said it was mother's choice because Madison was in her care.

Marvin also said that mother told him about her burn, but she claimed that the man who rented her a house had burned her.

16

*Last Minute Information for the Court*

On October 8, 2021, DCFS provided the juvenile court with a copy of the Traffic Crash Report documenting mother's May 19, 2021, car accident.

DCFS reported that mother visited Madison and Melany, but mother did not give Madison the same affection as Melany, she arrived late to visits, talked about the case to the children, berated the social worker, or she was on her phone. The dependency investigator reported that Madison admitted that she stole something from the social worker's car and that she purposely hurt Melany by either biting or pinching her so that the social worker would think Melany was being abused in her father's home.

DCFS filed an additional Last Minute Information for the Court Report on October 15, 2021, updating the court on mother's visits. Mother had had a visit with Melany and wanted to change Melany's clothes in public. When the social worker asked mother not to do this, mother contacted 911 claiming that a "'male'" was harassing her and Melany at the park; she did not tell the 911 operator that the "'male'" was a DCFS social worker. Mother pulled a random stranger aside to talk about the case and when the individual saw the DCFS social worker, the person dismissed her. Mother also reported that she was sick but would not submit to a COVID test and stopped the visits. DCFS recommended that mother's visits be monitored at the DCFS office.

*Adjudication Hearing (Oct. 18 & 19, 2021)*

The juvenile court received various exhibits into evidence and took judicial notice of all documents and orders from the

cases concerning mother. It did not admit mother's documents into evidence.

After considering all of the evidence and the parties' arguments, the juvenile court said that its biggest concern was that mother did what was needed when her voluntary case was open with DCFS and as soon as the case was going to close, mother stopped following through. It also expressed concern with mother's behavior in general. Thus, it sustained the allegations as pled and/or amended the allegations to conform to proof.[5]

*Disposition Hearing (Oct. 19, 2021)*

Turning to disposition, the juvenile court found by clear and convincing evidence that there was a substantial danger and risk of detriment should the children remain in mother's home. Regarding Madison, it also found that she could not be safely placed in Marvin's home; thus, she remained placed with Leonel. Melany was placed in Rene's custody, and the juvenile court terminated jurisdiction as to her with a custody order in place.

*Appeal*

Mother timely filed a timely appeal.

## DISCUSSION

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings and dispositional order for substantial

---

[5] The juvenile court sustained counts a-1 (physical abuse of Madison), b-1 through b-3 (physical abuse of Madison, endangering the children while driving, failure to ensure that Madison takes her prescribed medication), and j-1 and j-2 (Melany is at risk of harm as a result of mother's physical abuse and medical neglect of Madison).

evidence.  (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value.  (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B.*, *supra*, at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)  "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders."  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)  "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]"  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellant, mother must establish that the challenged rulings are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

That said, "when a heightened standard of proof applied before the trial court, an appropriate adjustment must be made to appellate review for sufficiency of the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010.)  "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof."  (*Id.* at p. 1005.)  In other words, "the clear and convincing standard of proof [has an] effect

19

on appellate review for sufficiency of the evidence." (*Id.* at p. 1010.)

II. *Jurisdiction*

Mother argues that the juvenile court erred in assuming jurisdiction over the children because there is insufficient evidence to support the sustained counts.[6]

A. Applicable law

Section 300, subdivision (a), authorizes dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) Striking a child with an open hand or fist, causing bruises, constitutes serious physical harm within the meaning of section 300, subdivision (a). (See *In re Veronica G.* (2007) 157 Cal.App.4th 179, 185–186.) Even evidence of a single incident of physical harm to a child is sufficient for the juvenile court to assume jurisdiction under this provision. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.)

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical

---

[6] We agree that mother's appeal is justiciable.

20

harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child."  (§ 300, subd. (b)(1).)  Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1):  "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).  [Citations.]"  (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1396.)

"[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection.  [Citations.]  A parent's past conduct is a good predictor of future behavior.  [Citation.]  'Facts supporting allegations that a child is one described by section 300 are cumulative.'  [Citation.]  Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'  [Citation.]"  (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Section 300, subdivision (j), authorizes dependency jurisdiction over a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent

21

or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

B. <u>Analysis</u>

Applying these legal principles, the evidence supports a finding that Madison suffered both nonaccidental (§ 300, subd. (a)) and accidental (§ 300, subd. (b)) injuries when mother hit her in the face with keys and scratched her. Even with law enforcement's conclusion that Madison, not mother, was the perpetrator of the injuries, the doctor who examined the child concluded that "the injuries on . . . Madison's left cheek [were] too wide to have been caused by scratching" and the findings were consistent with physical abuse. Further, "[p]hysical findings on the child's left cheek are consistent with [Madison's] history of being hit in the face/scratched with keys. Smaller abrasion under the left eye and on upper lip are consistent with mom's reported history of scratching the child."

And, there was evidence that Madison was facing a substantial risk of recurring physical abuse. Apart from the incident that led to the dependency referral, Madison reported that mother hit her on numerous occasions, including with a belt and broom.[7] Rene also reported that he witnessed mother mistreating her children. In fact, she was verbally abusive to Madison, and mother had slapped Madison's face and punched her.

---

[7] Mother asks us to reject this evidence, pointing out that Madison was manipulative and suffers from angry outbursts. The juvenile court was free to credit Madison's testimony and disregard evidence that called her testimony into question. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

22

Statements from Madison's adult siblings, Byron and Leonel, bolster the juvenile court's findings. When interviewed, Byron said that mother did not treat Madison the same as she treated Melany. When asked if he was concerned about Madison being abused or neglected, Byron told the social worker to look at the family's case history. And, Byron noted his lack of a close relationship with mother.

Leonel echoed Byron's comments, saying that he understood the concerns for abuse, he did not have a good relationship with mother, and he was not involved with mother.

Mother's reliance upon *In re Emily L.* (2021) 73 Cal.App.5th 1 is misplaced. That case involved a single physical altercation between a mother and her teenage daughter. (*Id*. at p. 16.) Under these circumstances, and the fact that the teenager "had turned her life around," the Court of Appeal reversed a juvenile court's jurisdictional finding under section 300, subdivision (b). (*In re Emily L., supra,* at p. 15.) In so doing, the court noted that "there was . . . no evidence that a violent altercation . . . would occur again." (*Id*. at p. 16.) "Given the lack of substantial evidence of any risk of future harm to [the child] at the time of the jurisdictional hearing," the court held that the juvenile court "erred in assuming jurisdiction over this action." (*Id*. at p. 17.)

In contrast, as set forth above, the incident between Madison and mother was not a single incident unlikely to recur. There is ample evidence that Madison was subjected to ongoing, numerous acts of physical abuse by mother.

Urging us to reverse, mother argues that, during the voluntary family maintenance case, the family received services and no abuse occurred during that period. However, Madison

said that when the voluntary maintenance case was closing and Keileen went to live with her father, mother began hitting her again. Madison said that she tried to tell her school, but then recanted because mother told her to. Furthermore, as the juvenile court aptly noted, when the voluntary case was going to close, mother stopped taking care of Madison's mental health needs. Thus, the fact that no abuse occurred during the voluntary family maintenance case period does not compel reversal here.

Finally, the juvenile court's finding pursuant to section 300, subdivision (j), is affirmed. Mother does not challenge that finding on appeal. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

III. *Disposition*

Mother argues that the evidence fails to support the juvenile court's order removing Madison[8] from her custody.

A. Applicable law

"Our society does recognize an 'essential' and 'basic' presumptive right to retain the care, custody, management, and companionship of *one's own child*, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and

---

[8] As set forth above, mother only objects to the juvenile court's order vis-à-vis Madison. Thus, our analysis focuses solely on Madison. That said, for the same reasons the juvenile court did not err in removing Madison, the juvenile court properly removed Melany from mother's custody.

child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.) "The Juvenile Court Law restricts judicial power to remove a child from the care and society of even an abusive or abuse-tolerant parent. [Citations.]" (*In re Kieshia E., supra*, at p. 77.)

The decision to remove a child from parental custody is only authorized when a juvenile court finds, by clear and convincing evidence, that "'[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'" (§ 361, subd. (c)(1); *In re H.E.* (2008) 169 Cal.App.4th 710, 718.) The focus of the statute is on averting harm to the child. (*In re Alexzander C., supra*, 18 Cal.App.5th at p. 451.)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.]" (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

### B. Analysis

Applying these legal principles under the appropriate standard of review, we conclude that ample evidence supports the juvenile court's finding that Madison would have been at substantial risk of serious physical harm if returned to mother. As set forth above, this family was referred to DCFS following a violent altercation between Madison and mother. And, Madison reported that this was not the only time that mother hurt

25

Madison. Madison reported to the social worker that mother hit her on numerous occasions, including with a belt and broom. Rene confirmed Madison's statements; he had seen mother verbally and physically abuse Madison. Under these circumstances, we agree that Madison cannot be returned to mother's custody safely.

Mother's argument on appeal focuses on Madison's behavioral issues, the services Madison received, and Madison's failure to make progress. But placing the blame on Madison does not erase the risk of harm to her. Notably, Madison has been diagnosed with a disorder characterized by the behaviors that mother faults her for but failed to assist her with treatment (i.e., ensuring she took her prescribed medication). Because mother neglected to help Madison with her medical issues, Madison cannot be safely returned to her.

*In re M.V.* (2022) 78 Cal.App.5th 944 does not compel a different conclusion. In that case, the children were removed because the trial court found the parents were in denial about the sustained allegations. (*Id.* at p. 957.) The Court of Appeal reversed the removal order, noting that the social worker had testified, without qualification, that there was no safety risk to placing the children with their father. (*Id.* at p. 961.) And, the father had exceeded all expectations in his parenting and domestic violence classes. (*Id.* at p. 963.)

In contrast, in this case, mother directs us to no evidence in the appellate record that shows that Madison and Melany could be safely returned to her custody. And, unlike the father in *In re M.V.*, mother had been offered "many years of services to help ameliorate the causes that continue to bring her and her children to the attention of DCFS," but had not made any progress.

26

Furthermore, mother's issues were not limited to Madison; mother has complex relationships with all of her children, she continues to disobey the juvenile court's orders and fails to acknowledge her medical condition. As DCFS noted in its jurisdiction/disposition report: "None of the services that [DCFS] has offered since 2009-2021 to the mother or the programs she ha[s] participated in have mitigated the risk, as she continues to come to the attention of DCFS for the same causes."

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:



_____, P. J.
LUI



_____, J.
CHAVEZ